Jon D. Graves, Legal Counsel, SC #10554
Hutchinson Correctional Facility
P.O. Box 1568
Hutchinson, KS 67504-1568
Telephone: (620) 625-7253
Jon.Graves@ks.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SEAN E. MCDONALD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 24-3019-JWL |
| ) | |
| TOMMY WILLIAMS, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## REPORT IN "MARTINEZ v. AARON" INVESTIGATION

## CIVIL RIGHTS COMPLAINT

On February 5, 2024, plaintiff Sean E. McDonald filed a civil rights action pursuant to 42 USC §1983 in the United States District Court for the District of Kansas. (Doc. 1)  At all relevant times plaintiff, Sean E. McDonald, inmate number 113183, was an inmate incarcerated in the custody of the Secretary of Corrections of the State of Kansas.  February 12, 2024, the Court issued an order directing the preparation of a Martinez Report limited to the issue of the medical care received by plaintiff at the Larned State Correctional Facility (LSCF) on October 31, 2023, from Corrections Officer Gregory Dimarzo.  Plaintiff was also ordered to show cause

1

why his claims against Tommy Williams, Warden of the El Dorado Correctional Facility, should not be dismissed. (Doc. 4)

The Court issued an order on February 26, 2024, following a response to the show cause order by plaintiff on February 23, 2024, dismissing all claims against defendant Tommy Williams. (Doc. 7)

## SUMMARY OF ALLEGATIONS IN PLAINTIFF'S PETITION REGARDING DEFENDANT DIMARZO

Plaintiff alleges that defendant Dimarzo (defendant) was assigned to work in the cellhouse in which plaintiff was housed on October 31, 2023. (Doc 1 p. 1)

Plaintiff reported to defendant at least four times on October 31, 2023, that he was experiencing mental distress and had suicidal thoughts. Defendant refused to get him mental health staff as required by facility policy and department regulations. Plaintiff was told to fill out a sick call slip instead. Plaintiff then slit both wrists with a razor and defendant then had additional assistance called. (Doc.1 pp. 2, 4)

Plaintiff alleges that defendant knowingly disregarded this threat to plaintiff's health and safety and in doing so violated plaintiff's Eighth Amendment rights. Doc.1 p. 4)

Plaintiff alleges he has exhausted his administrative remedies by filing a grievance and a property claim. (Doc.1 p.5)

**Requested Relief**

Plaintiff seeks an injunction that would direct additional training to be conducted by the Kansas Department of Corrections across the state.

Plaintiff seeks declaratory relief to cause his transfer to a low medium security facility as opposed to the high medium security facility in which he currently is housed, which plaintiff believes is because he files grievances. Plaintiff alleges further down that he is a minimum security inmate. (Doc. 1 pp. 4,5)

Plaintiff also seeks compensatory damages of $15,000.00 for the harm he did to himself and punitive damages of $20,000.00 (Doc.1 pp. 4,5)

## UNCONTROVERTED STATEMENT OF FACTS

### I.    PLAINTIFF HOUSING INFORMATION

Plaintiff, Sean E. McDonald, is an inmate legally incarcerated in the custody of the Secretary of Corrections, State of Kansas, serving sentences for four violations of the Kansas Offender Registration Act. Plaintiff has an earliest release date of February 12, 2026. Plaintiff has a current custody level of minimum and is presently housed at the El Dorado Correctional Facility to where he was transferred on January 8, 2024.   (See Kasper Sheet Exhibit 1 pp. 1, 2)

### II.    DEFENDANT'S STATEMENT REGARDING EVENTS AT THE LARNED STATE CORRECTIONAL FACILITY ON OCTOBER 30 & 31, 2023

Plaintiff was transferred from the El Dorado Correctional Facility to the Larned State Correctional Facility on April 18, 2023, and remained there until he was transferred to the El Dorado Correctional Facility (Exhibit 1 p. 2)

Defendant Greg DiMarzo was a Corrections Officer I at the Larned State Correctional Facility on October 30, 2023, and remembers dealing with plaintiff as his overnight shift began. Plaintiff was in cell F123 in the central unit clinic.

Defendant made his first round of security and accountability checks at 10:03 p.m.. Plaintiff told him he was hearing voices and needed to see the nurse. He was told that he needed to put in a sick call slip.  Plaintiff did not like that answer and began pestering the inmate porters to see if defendant had called a nurse for plaintiff

Defendant made his second round of security and accountability checks at 10:32 p.m.. Mr. McDonald asked defendant if he had called the nurse and was told he had not done so.  Plaintiff was reminded that he needed to submit a sick call slip.  Plaintiff again insisted that he needed to see the nurse because he was trying to not go on mental health crisis level. He was again told that the nurse was not going to be called and Plaintiff responded "alright then".  Defendant emailed his supervisor, Michael Sterns, about what had happened and Mr. Sterns responded that he remembered a while back that plaintiff had an approved PRN (pro re nata)(take as needed) medication but didn't know whether it was still approved for plaintiff to take. Defendant discovered that RN Burger was on duty at that time.

Defendant had just worked an overtime shift as clinic security and was told that plaintiff had said the same thing the previous week and RN Young said then that plaintiff was told he needed to put in a sick call slip.

Putting in a sick call slip means that an inmate has to fill out a request form and turn it in for the clinic staff to review and call the inmate to the clinic.  Plaintiff didn't want to wait.

Defendant made two extra security checks of Plaintiff's cell at 10:36 p.m. and 10:45 p.m.  Plaintiff and his cell mate had obscured the viewing window each of those times.  Defendant's supervisor told him to wait until count time and to then issue both

4

residents a disciplinary report for interfering with official duties because security officers need to see into the cells to do a proper security check.

Defendant performed another security and accountability check at 11:00 p.m. and formal count time was at 11:30 p.m.  Count cleared at 11:48 p.m. defendant performed another security and accountability check at 12:00 a.m.  Everything seemed alright regarding Mr. McDonald.

At 12:17 a.m. Defendant received a phone call from the Rotunda post notifying him that someone in plaintiff's cell, F123, was hitting the intercom button repetitively and reporting there was a medical emergency. Defendant ran to the cell and saw plaintiff sitting on the bottom bunk with a razor in his left hand and blood dripping from his right wrist.  There were two pools of blood on the floor and one blood soaked towel. Defendant called for a medical response to that cell and reported it appeared to involve self-harm.  When the response team arrived plaintiff was directed to drop the razor and plaintiff complied. Plaintiff was then restrained and taken to the clinic at 12:19 a.m.

When defendant looked into plaintiff's cell, he could see plaintiff was holding a razor blade in one hand. Even with plaintiff's cellmate removed from the cell, defendant would not rush into the cell to give medical aide. The correct protocol is to call for assistance by security and medical staff. Once the weapon is surrendered and the response team arrives, the resident can be approached to restrain him in his cell. The resident would then be restrained for everyone's safety, including the resident's own safety. Additionally, a single security officer should never enter a cell with a resident by himself.  To do so can be very dangerous. The cell door can close behind the officer,

locking him or her, with no way out without someone else unlocks the cell from the outside. The security key is useless inside a locked cell.

Defendant indicates that every situation is different. It's not that defendant wouldn't be able to pack a wound with pressure to stop the bleeding. Depending on the circumstances, defendant might have to do that. In this particular situation, since security and medical staff arrived and plaintiff was still holding a razor, plaintiff represented a risk to all staff and to plaintiff. When entering the cell, the first priority was to restrain plaintiff. Since medical staff was on scene, it was best for the medical professional to provide medical care, rather than the security staff, though we are trained in basic first aid training, such as CPR.

Regarding the medical care provided to plaintiff on October 31, 2023, defendant believes plaintiff was first restrained. Then something was used to control bleeding, a cloth of some kind from inside the cell. Other than that, plaintiff wasn't given any medical aid until after plaintiff was escorted to the clinic. Defendant stayed on the unit to deal with the aftermath of the situation and doesn't know what medical aid was given plaintiff inside the clinic that night.

Plaintiff told defendant during the early part of the shift beginning October 30, 2023, that plaintiff needed to see a nurse, that plaintiff was hearing voices and that plaintiff was not trying to go on crisis level. None of those statements necessarily indicate plaintiff was having thoughts of self harm. If a resident reported to defendant that the resident was having thoughts of self harm or suicide, defendant is mandated to tell his supervisor(s) and to then stay with the resident until they can be escorted to the clinic to be seen by medical or mental health staff. Defendant has experience with residents

6

stating they are having those kind of thoughts of self harm or suicide and defendant handled those situations as indicated.

Defendant cannot remember if he called the nurse that evening before the self-harm had occurred.

Plaintiff did not say anything about suicide to defendant. Had he done so a different protocol would have been followed and he would likely be put on a crisis level.

Plaintiff identifies as a female so his medical record will reflect that gender identification.

Defendant wrote a series of emails to his supervisor as the events of this lawsuit unfolded and used the same email to recount to counsel the times he logged his rounds. (DiMarzo Affidavit Exhibit 2)(Email series dated October 30, 2023 Exhibit 3)(DiMarzo's Incident Report Exhibit 4)

Registered Nurse Dana L. Burger examined and treated plaintiff after he was transported to the clinic at 1:30 a.m. on October 31, 2023. In summary, none of the cuts were actively bleeding and all of the cuts were closed with glue. Then both wrists were wrapped with gauze to prevent plaintiff from trying to open the wounds. Plaintiff was then housed in the infirmary on mental health crisis level 3 and was under constant observation. The medical record attached to defendant's Incident Report, Exhibit 4, reflects these facts as well at in the full medical record contained at Exhibit 13. The content of the medical record in Exhibit 4 recites as follows:

> A1 medical emergency called for pt with self-inflicted cuts to both wrists. She is brought to the clinic. Immediately wrap both wrists with compression/gauze roll. VS obtained. Pt is alert and oriented. Wait about 10 minutes then removed dressing to assess. Left wrist: At base of wrist bend 1 ½ in laceration, not actively

7

> bleeding closed with glue. Below that is a 1 in laceration, not actively bleeding, closed with glue. Below that is a 1 ½ in superficial laceration closed with two steri strips. Right wrist: at the base of wrist bend there are two separate cuts, both 1 ½ inches, not actively bleeding and both closed with flue. Gauze roll used on each wrist to cover them to prevent pt from trying to reopen the wounds. Pt remains alert, oriented, and stable. Will be housed in the infirmary on CL3 so she will be under 1:1 observation.

(Exhibit 4 attachment to Incident Report and Exhibit 13 medical record)

### III.   ADDITIONAL DOCUMENTS

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff filed a property claim on November 12, 2023, which was denied on December 12, 2023, as untimely for being filed outside the 10 day limit set out in Internal Management Policy and Procedure 01-118D. No further appeal has been located. (Exhibit 15)

Plaintiff filed undated grievance number IA-003348 which was first received by unit team around 11/15/23. Plaintiff was told the subject matter of the grievance would be investigated, but that no further action on the grievance was necessary. Plaintiff appealed and was told on December 19, 2023, that the grievance was invalid because it was clearly about a personal injury claim, which was not grievable under K.A.R. 44-15-101a(d)(2). No further appeal to district court has been located. It appears that plaintiff knew his property claim was out of time and he decided to try a grievance on the same topic. (Exhibit 16)

### POLICIES

The Kansas Department of Corrections has department wide policies regarding medical care, including:

Internal Management Policy and Procedure 10-105D provides for facility suicide prevention programs. (Exhibit 8)

Internal Management and Procedure 10-121D describes the qualifications, roles and responsibilities of health care personnel. (Exhibit 9)

Internal Management Policy and Procedure 16-107D provides for Access to and availability of health care services. (Exhibit 10)

Internal Management Policy and Procedure 16-108D provides for the availability to inmates of medical, dental and behavioral health services. (Exhibit 11)

The Larned State Correctional Facility has a facility specific general order providing for medical care of inmates.

Larned State Correctional Facility General Order 13-101 relates to inmate access to health care and to keep on person Medication. (Exhibit 12)

**MISCELLANEOUS RECORDS**

Incident report generated by defendant on October 31, 2023, which had the immediate care medical record attached dated October 31, 2023. (Exhibit 4)

Segregation placement report dated October 31,2023. (Exhibit 6)

Initial segregation review record dated November 2, 2023. (Exhibit 5)

Initial medical records after plaintiff cut himself on October 31, 2023, including suicide monitoring visit. (Exhibit 4)

Medical records from April 18, 2023, to February 12, 2024. (The records are on CD. Plaintiff will be provided with a printed copy of those records. Records will be submitted under seal) (Exhibit 13)

Crisis Level Observation Log from October 31, 2023, to November 9, 2023. (Exhibit 14)

## **CONCLUSION**

The defendant correctional officer understood that plaintiff said he was hearing voices and wanted to see the nurse. Plaintiff was told to submit a sick call slip to see the care provider. Plaintiff tasked the inmate porters with repeating to the defendant the statement he wanted to see the nurse and they were told the same thing. Defendant again advised plaintiff on his next round a half hour later that he should submit a sick call slip. This did not please plaintiff. After two additional security checks on plaintiff and one more round, a security count was conducted and plaintiff was again viewed at midnight and seemed fine. A few minutes later his roommate pounded on his intercom and reported a medical emergency in the cell. Plaintiff responded and found plaintiff had slit both wrists twice and was sitting between two pools of his blood.

Defendant advises that plaintiff said nothing about suicide and defendant stated that had plaintiff done so defendant would have followed a different protocol. Defendant also knew that plaintiff had used the same manipulative tactic the prior week to try and get out of his cell. Plaintiff was also told then to put in a sick call.

If no statement about suicide was made then no Eighth Amendment violation appears to exist. If a statement about suicide was made, whether or not additional protocols were followed by defendant, it still doesn't appear to violate the high standard of the Eighth Amendment given the facts alleged.

Plaintiff was treated by medical staff who examined the cuts and then glued the cuts closed. This treatment took place within a short time after plaintiff was transported to the clinic by security staff.

It is also unclear whether plaintiff has exhausted his administrative remedies for his claims since both his grievance and property claim were rejected for different reasons. No further appeal from either administrative process was found. If plaintiff did not exhaust his administrative remedies, then the lawsuit cannot proceed for that reason.

Respectfully submitted,

 /s/ Jon D. Graves_____
Jon D. Graves #10554

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following: None.   I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

    Sean E. McDonald #113183
    El Dorado Correctional Facility
    PO Box 311
    El Dorado, KS 67042

\_\_/s/ Jon D. Graves_____
Jon D. Graves

## **EXHIBIT LIST**

1. KASPER Inmate Data Summary sheet for Sean E. McDonald
2. Affidavit of Greg DiMarzo
3. Email from Greg DiMarzo to supervisor and partly to counsel dated October 30, 2023 and February 17, 2024
4. Incident Report from Greg DiMarzo dated October 31, 2023, with medical records from October 31, 2023, also attached
5. Administrative Segregation dated November 2, 2023
6. Administrative Segregation Report dated October 31, 2023
7. Behavioral Health Suicide Observation and other medical records and reports created shortly after Plaintiff cut himself October 31, 2023
8. Internal Management Policy and Procedure 10-105D
9. Internal Management Policy and Procedure 10-121D
10. Internal Management Policy and Procedure 16-107D
11. Internal Management Policy and Procedure 16-108D
12. Larned State Correctional Facility General Order 13-101
13. Medical record from April 12, 2023 forward
14. Inmate Crisis Level Observation Log covering dates of October 31, 2023 through November 9, 2023
15. Unnumbered Property Damage/Loss or Personal Injury claim dated November 12, 2023
16. Grievance IA003348 not dated by plaintiff, but first responded to by unit team on November 15, 2023.

I, Jon D. Graves, certify that the attached are true and correct copies of records kept in the normal course of business by the Kansas Department of Corrections and the published Kansas Statutes Annotated, Kansas Administrative Regulations, Kansas Department of Corrections Internal Management Policy and Procedures, and Larned State Correctional Facility General Orders


/s/ Jon D. Graves_____                                             March_28, 2024___
Jon D. Graves                                                                                  Date

   Subscribed and sworn to before me this 28th day of March, 2024.


                                         __/s/ Rhonda K. Severin_____
                                                    Notary Public

My Commission Expires:  11-18-2026