# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**SEAN E. MCDONALD,**

     **Plaintiff,**

     v.                       **CASE NO.  24-3019-JWL**

**TOMMY WILLIAMS, et al.,**

     **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On February 12, 2024, the Court entered a Memorandum and Order (Doc. 4) ("M&O") finding that the proper processing of Plaintiff's Eighth Amendment claim against Defendant DiMarzo could not be achieved without additional information from appropriate KDOC officials.  The Court also directed Plaintiff to show good cause why his[1] claims against Defendant Tommy Williams should not be dismissed.  Plaintiff filed a response (Doc. 6), indicating that he had no objection to the dismissal of his claims against Warden Tommy Williams.  Therefore, the Court entered a Memorandum and Order (Doc. 7) dismissing Plaintiff's claims against the Warden.

The Court's M&O provided that "[o]nce the Report has been received, the Court can properly screen Plaintiff's claim under 28 U.S.C. § 1915A."  (Doc. 4, at 9.)  The *Martinez* Report (Doc. 9) (the "Report") has now been filed.  This matter is before the Court for screening

---

[1]  Although the Report indicates that "Plaintiff identifies as a female" and that Plaintiff's "medical records reflect that gender identification" (Doc. 9, at 7), because Plaintiff uses male pronouns in his Complaint, the Court will likewise use them in this Memorandum and Order.  *See, e.g.,* Doc. 1, at 4 ("McDonald informed guard G. Dimarzo countless times he was experiencing mental health issues" and "McDonald in his depressed state of mind sat down on his bunk took his razor and slit both his wrist[s]").

Plaintiff's Eighth Amendment claim against Defendant DiMarzo. The facts and the Court's screening standards are set forth in the Court's M&O.

## I. Nature of the Matter before the Court

Plaintiff alleges deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Plaintiff's factual allegations are set forth in detail in the Court's M&O. In summary, Plaintiff alleges that while housed at the Larned State Correctional Facility ("LSCF") on October 31, 2023, he reported to CO DiMarzo that Plaintiff was in mental distress and DiMarzo refused to get treatment for Plaintiff in accordance with facility policy and department regulations. (Doc. 1, at 2; Doc. 1–1, at 2.) Plaintiff alleges that when his requests for medical help were denied, he was in a depressed state and sat down on his bunk and used his razor to slit both of his wrists. (Doc. 1, at 4.) Plaintiff alleges that it was only after Plaintiff slit his wrists that DiMarzo called a medical code. *Id.*

## II. The Report[2]

The Report provides that Plaintiff was transferred from EDCF to LSCF on April 18, 2023, and remained there until he was transferred back to EDCF on January 8, 2024. (Doc. 9, at 3; Doc. 9–1, at 2.) The Report further provides that:

> Defendant Greg DiMarzo was a Corrections Officer I at the Larned State Correctional Facility on October 30, 2023, and remembers dealing with plaintiff as his overnight shift began. Plaintiff was in cell F123 in the central unit clinic.
> Defendant made his first round of security and accountability checks at 10:03 p.m.. Plaintiff told him he was hearing voices and needed to see the nurse. He was told that he needed to put in a sick call slip. Plaintiff did not like that answer

---

[2] Although much of the Report focuses on the medical care Plaintiff received after he inflicted self-harm, Plaintiff does not raise a claim regarding the medical care he received in response to his injuries. In fact, he alleges in his Complaint that "[o]nly after substantial harm was inflicted did the KDOC guard DiMarzo act accordingly with policies and regulations and call a medical code." (Doc. 1, at 4.) Therefore, the Court is not addressing the references in the Report to his medical care after his injuries.

and began pestering the inmate porters to see if defendant had called a nurse for plaintiff[.]

Defendant made his second round of security and accountability checks at 10:32 p.m.. Mr. McDonald asked defendant if he had called the nurse and was told he had not done so. Plaintiff was reminded that he needed to submit a sick call slip. Plaintiff again insisted that he needed to see the nurse because he was trying to not go on mental health crisis level. He was again told that the nurse was not going to be called and Plaintiff responded "alright then". Defendant emailed his supervisor, Michael Sterns, about what had happened and Mr. Sterns responded that he remembered a while back that plaintiff had an approved PRN (pro re nata)(take as needed) medication but didn't know whether it was still approved for plaintiff to take. Defendant discovered that RN Burger was on duty at that time.

Defendant had just worked an overtime shift as clinic security and was told that plaintiff had said the same thing the previous week and RN Young said then that plaintiff was told he needed to put in a sick call slip.

Putting in a sick call slip means that an inmate has to fill out a request form and turn it in for the clinic staff to review and call the inmate to the clinic. Plaintiff didn't want to wait.

Defendant made two extra security checks of Plaintiff's cell at 10:36 p.m. and 10:45 p.m. Plaintiff and his cell mate had obscured the viewing window each of those times. Defendant's supervisor told him to wait until count time and to then issue both residents a disciplinary report for interfering with official duties because security officers need to see into the cells to do a proper security check.

Defendant performed another security and accountability check at 11:00 p.m. and formal count time was at 11:30 p.m. Count cleared at 11:48 p.m. [and] defendant performed another security and accountability check at 12:00 a.m. Everything seemed alright regarding Mr. McDonald.

At 12:17 a.m. Defendant received a phone call from the Rotunda post notifying him that someone in plaintiff's cell, F123, was hitting the intercom button repetitively and reporting there was a medical emergency. Defendant ran to the cell and saw plaintiff sitting on the bottom bunk with a razor in his left hand and blood dripping from his right wrist. There were two pools of blood on the floor and one blood soaked towel. Defendant called for a medical response to that cell and reported it appeared to involve self-harm. When the response team arrived plaintiff was directed to drop the razor and plaintiff complied. Plaintiff was then restrained and taken to the clinic at 12:19 a.m.

\* \* \* \*

Plaintiff told defendant during the early part of the shift beginning October 30, 2023, that plaintiff needed to see a nurse, that plaintiff was hearing voices and that plaintiff was not trying to go on crisis level. None of those statements necessarily indicate plaintiff was having thoughts of self harm. If a resident reported to defendant that the resident was having thoughts of self harm or suicide, defendant is mandated to tell his supervisor(s) and to then stay with the resident until they can be escorted to the clinic to be seen by medical or mental health staff. Defendant has experience with residents stating they are having those kind of thoughts of self harm or suicide and defendant handled those situations as indicated.

Defendant cannot remember if he called the nurse that evening before the self-harm had occurred.

Plaintiff did not say anything about suicide to defendant. Had he done so a different protocol would have been followed and he would likely be put on a crisis level.

(Doc. 9, at 3–7; *see also* Doc. 9–2, Affidavit of Greg DiMarzo.)

The Report provides that "[i]t is unclear whether plaintiff has exhausted his administrative remedies for his claims since both his grievance and property claim were rejected for different reasons" and "[n]o further appeal from either administrative process was found." (Doc. 9, at 11.) However, the Report also provides that Plaintiff did appeal grievance number IA-003348 and "was told on December 19, 2023, that the grievance was invalid because it was clearly about a personal injury claim, which was not grievable under K.A.R. 44-15-101a(d)(2)." *Id*. at 8. The Report further provides that "[n]o further appeal to district court has been located" and "[i]t appears that plaintiff knew his property claim was out of time and he decided to try a grievance on the same topic." *Id*.

## III. DISCUSSION

### 1. Exhaustion

An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all

available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted).  "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it."  *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249; *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting *Jones*, 549 U.S. at 211)).  A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein.  *Little*, 607 F.3d at 1249 (citing *Woodford v. Ngo*, 548 U.S. 81, 90

(2006)). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis. K.A.R. § 44–15–101(b). If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections. K.A.R. § 44–15–101(d). The procedure to follow at each level is described in detail in the Kansas Administrative Regulations. § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

As this Court has previously found, there are two distinct avenues of administrative exhaustion established in Kansas law:

> The first avenue is found in the regulations codified by Article 15 of chapter 44 of the Kansas Administrative Regulations. These regulations govern inmate grievances covering "a broad range of matters that directly affect the inmate, including" complaints about policies and conditions of imprisonment, actions of employees and other inmates, and incidents occurring within the facility. Kan. Admin. Regs. § 44–15–101a(d)(1)(A)–(B). As the Court previously determined, this regulation applies to a constitutional

> claim such as the one asserted here, where the conduct complained
> of stems from "actions by employees" of the prison facility. *Id*.
> § 44–15–101a(d)(1)(B).

*Lewis v. Carrell*, 2015 WL 413640, at *2–3 (D. Kan. 2015).  "The second avenue is governed by the regulations in Article 16 of chapter 44 of the Kansas Administrative Regulations." *Id*. at *3.  Kan. Admin. Regs. § 44–16–104a applies to claims for personal injury and provides: "(a) Each inmate claim for personal injury shall be submitted to the [prison] facility and [the] secretary of corrections within 10 calendar days of the claimed personal injury." *Id*. (citing Kan. Admin. Regs. § 44–16–104a).

The Kansas Court of Appeals has explained that the two sets of regulations found in Articles 15 and 16 are "separate and distinct" from one another. *Id*. (citing *Redford v. Kan. ex rel. Dep't of Corr.*, 295 P.3d 1054, 2013 WL 781102, at *6 (Kan. Ct. App. Mar. 1, 2013 (unpublished table decision)).  Indeed, the regulation "expressly provides: 'The grievance procedure [in article 15] shall not be used in any way as a substitute for, or as part of, the  . . . property loss or personal injury claims procedure [in Article 16] . . .'" *Id*. (quoting Kan. Admin. Regs. § 44–15–101a(d)(2); *see also Sharrock v. Stephens*, 2011 WL 5526444, at *1 (D. Kan. 2011) ("Importantly, the requirements in [§ 44–16–104a] apply regardless of whether the inmate pursues a grievance pursuant to § 44–15–101.").

The Court in *Conley* addressed defendants' argument that plaintiff failed to file a personal injury claim in a § 1983 case, and noted that while case law establishes that exhaustion of Article 15's procedures alone is not sufficient for a plaintiff to assert a personal injury claim, the Court "had not located any authority requiring an inmate to exhaust both the requirements of Article 15 and Article 16 before asserting a § 1983 claim based on an alleged violation of an inmate's constitutional rights" and declined to invent such a requirement. *Conley v. Pryor*, 2015

WL 413638, at *14 (D. Kan. 2015).  However, the Court did find that exhaustion under § 44–15–101 was necessary for plaintiff's § 1983 claim.  *Id*.  The Court found that where plaintiff asserted a § 1983 claim for failure to provide proper dental care, plaintiff's claim constituted a complaint about the conditions of his imprisonment and the actions of employees, which requires exhaustion under Kan. Admin. Regs. § 44–15–101.  *Id*.  Likewise, the Court in *Nunez*, stated that "an inmate who wishes to pursue both a personal injury claim and a § 1983 claim must comply with two distinct sets of administrative procedures even if he bases his claims on a single act." *Nunez v. Heimgartner*, 2017 WL 2264466, at *5 (D. Kan. 2017) (citation omitted).  The Court held that "Article 15 of the KDOC regulations covers the administrative procedures that must proceed a § 1983 claim."  *Id*. at *6 (citation omitted); *see also Jones v. Parks*, No. 19-cv-3175-HLT-GEB, Doc. 50 at n.3 (D. Kan. April 13, 2021) ("Plaintiff's alleged personal injury claims based off the same incidents does not exhaust his § 1983 claim.").

The Tenth Circuit has upheld the requirement that a plaintiff must comply with the requirements of § 44-15-101 prior to filing a § 1983 case, regardless of an attempt to comply with the requirements of § 44-16-104a.  *See Lynn v. Kelly*, 2022 WL 1043752, at *1 (10th Cir. 2022) (unpublished) ("Mr. Lynn may have attempted to comply with the distinct requirements of § 44-16-104a, but he wholly ignored the requirements of § 44-15-101. . . . As Mr. Lynn failed to comply with the established grievance process, summary judgment was proper."); *Kidd v. Baker*, 2022 WL 17485932, at *5–6 (D. Kan. 2022) (describing the dual-track system of administrative exhaustion set out in Kansas law), *affirmed* 2023 WL 2396530 (10th Cir. 2023).

The Tenth Circuit has explained:

[T]he initial burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA "lies with the defendant." If the defendant carries this burden, "the plaintiff must then demonstrate with specificity the existence of a disputed material

fact." A plaintiff's failure to meet this burden results in the
affirmative defense barring his claim and entitles the defendant to
summary judgment as a matter of law.

*Moore v. Tresch*, 2022 WL 612796, at *2 (10th Cir. Mar. 2, 2022) (unpublished) (internal

citations omitted).  Courts in this district have found that a defendant satisfies the initial burden

to show that a plaintiff failed to exhaust administrative remedies where the defendant provides a

KDOC records custodian affidavit that explains that they reviewed the grievance records and

found evidence that a plaintiff availed himself of the grievance process but did not complete it.

*See Lewis v. Carrell*, 2014 WL 4450147, at *10 (D. Kan. 2014) (citation omitted).

The Report in this case does not satisfy the initial burden with this type of evidence.  In

fact, the Report provides that "[i]t is unclear whether plaintiff has exhausted his administrative

remedies for his claims since both his grievance and property claim were rejected for different

reasons" and "[n]o further appeal from either administrative process was found."  (Doc. 9, at 11.)

At most, the Report reflects the position that exhaustion is unclear.  In a suit governed by the

PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof

regarding exhaustion of administrative remedies.  *Roberts v. Barreras*, 484 F.3d 1236, 1241

(10th Cir. 2007).

Plaintiff attaches to his Complaint his informal "Inmate Request to Staff Member" with a

response dated November 15, 2023. (Doc. 1–1, at 13.)  Plaintiff attaches his "Kansas Department

of Corrections Inmate Grievance Form" (*id*. at 7) and the "Principal Administrator's Response to

Grievance" received on November 16, 2023, and answered on November 17, 2023.  *Id*. at 6.  The

response informs Plaintiff that "[p]ursuant to K.A.R. 44-15-102, you may appeal the grievance

response by submitting the appropriate form to the secretary of corrections."  *Id*.  Plaintiff also

attaches a December 15, 2023 response by Libby T. Keogh, Corrections Manager II, telling

Plaintiff in reference to grievance IA-00348 [sic], that she sees that Plaintiff has received "a response from the Warden indicating that this matter was being turned over to EAI for investigation.  If you are not satisfied with this response, please follow the grievance procedures outlined in Article 15 of the Inmate Rule Book.  The next step if you are not satisfied with the Warden's response would be to appeal the matter to the Secretary of Corrections."  *Id*. at 1. Plaintiff then attaches his "Appeal of Grievance to Secretary of Corrections" referencing grievance IA-003348.  *Id*. at 3–11.  Plaintiff attaches a December 19, 2023 letter from Darcie Holthaus, Corrections Manager, informing him that his grievance IA 003348 is invalid and informing him that his "complaint is clearly about the property loss or personal injury claims procedure" and "KAR 44-15-101(a)(d)(2) prohibits use of the grievance procedure to address this concern."  *Id*. at 15.

The Report provides that Plaintiff did not appeal and then states that he did appeal and was told that he could not proceed under Article 15 despite the case law cited above requiring exhaustion under Article 15 prior to filing a § 1983 action and despite Keogh's instructions to follow Article 15 procedures and the Warden's response indicating that he could appeal the grievance response by submitting the appropriate form to the secretary of corrections.  The Report further provides that "[n]o further appeal to district court has been located" and "[i]t appears that plaintiff knew his property claim was out of time and he decided to try a grievance on the same topic."  (Doc. 9, at 8.)  But, Plaintiff is required to file a grievance under Article 15 "on the same topic" as set forth in the case law above. *See, e.g., Nunez*, 2017 WL 2264466, at *5 (citation omitted) ("an inmate who wishes to pursue both a personal injury claim and a § 1983 claim must comply with two distinct sets of administrative procedures even if he bases his claims

on a single act"). And, the administrative grievance procedure does not include an appeal to the district court as suggested in the Report.

Based on the attachments to Plaintiff's Complaint, the Court is not convinced at this screening stage that Plaintiff has failed to exhaust his administrative remedies. The Report does not satisfy the initial burden of showing a failure to exhaust, and if there was a failure, it is not clear that the proper procedures were made available considering the conflicting information given to Plaintiff that he should follow Article 15 procedures and that Article 15 procedures were prohibited. The exhaustion requirement extends only to the exhaustion of "available" remedies. *See Ross v. Blake*, 578 U.S. 632, 641–43 (2016). An administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "[I]nterference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* (citations omitted).

### 2. Eighth Amendment

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation

omitted).   A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

 "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id*. (quoting *Sealock*, 218 F.3d at 1209).   In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm.  *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993).   In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay.  *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted).   "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

Plaintiff alleges that he told Dimarzo "at least 4 times" that Plaintiff needed help. (Doc. 1, at 2.)  Plaintiff alleges in his Complaint that he "informed guard G. DiMarzo countless times he was experiencing mental health issues, requesting mental health staff for services due to suicidal thoughts" and he "was informed to fill out a sick call, for suicidal thoughts by guard DiMarzo." *Id*. at 4.  Plaintiff states that he "repeatedly asked for help as he was having suicidal thoughts and officer DiMarzo refused to get help."   *Id*. at 5. Plaintiff alleges that "DiMarzo

clearly knew the risk to inmate McDonald's health and safety and chose 'recklessly' to disregard it." *Id*. at 4. Plaintiff alleges in his attached grievance that he was in a crisis state for over two hours. (Doc. 1–1, at 5.) Plaintiff also had other inmates and the porters attempt to have DiMarzo get help for Plaintiff. *Id*. at 20. Plaintiff alleges that he is a "special needs mental health patient." *Id*.

> Plaintiff states in his grievance that:

>> CO1 DiMarzo failed to get me help when I was in a mental health crisis. I reached out to him 4 different times. Mental health staff and nursing staff both have told me to reach out before I self-harm. I did as they asked and reached out, but Ofc. DiMarzo took it upon himself to deny me any help so a code was called at 12:17 p.m. as I had cut both wrists. I told the above-named officer that I was in a crisis state and he refused to get medical attention. When I reached the clinic, the nurse asked why she didn't get called. I complained to Nurse Burger that I had asked Officer DiMarzo 4 times for help.

(Doc. 1–1, at 17) (cleaned up).

Plaintiff's medical records were filed conventionally as a sealed exhibit to the Report. (Doc. 12.) The records, consisting of 1477 pages, show that Plaintiff had a history of a suicide attempt as reflected in his records upon transfer to LSCF on April 18, 2023. *See* medical records of 4/18/2023 encounter, p. 7–8 (answering "Yes" to question "Have you ever done anything, started to do anything, or prepared to do anything to end your life?" and stating it was "Over a year ago"). In the month or so preceding the incident in this case, Plaintiff was placed on various crisis levels while at LSCF. The records show that Plaintiff was placed on CL 3 on August 26, 2023, "due to reporting swallowing a razor blade, suicide note found in property." *Id*. at medical records for 10/11/2023 Suicide Monitoring. Plaintiff was placed on CL 3 again on September 23, 2023, "due to self-harm by cutting her wrist with a razor . . . [s]he reports this act of self-harm was a suicide attempt and she wants to die." *Id*. at 09/29/2023 record for

Medication Management Without Psychotherapy.  Plaintiff was placed on various crisis levels during the month preceding the incident in this case, and was under "Behavioral Health Suicide Observation."

Although Plaintiff suggests in his Complaint that he was having suicidal thoughts, DiMarzo indicates that suicide was not mentioned to him when Plaintiff asked for help. DiMarzo does acknowledge in an email that when Plaintiff responded "alright then," this led DiMarzo "to believe we might have an interesting night."  (Doc. 9–3, at 3.)  "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'"  *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory."  *Id*. at 1139.  "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises."  *Id*. (citations omitted).  Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability."  *Id*.  "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances."  *Id*.  (citations omitted).

The Court finds that Plaintiff's Eighth Amendment claim against Defendant DiMarzo survives screening.  The *Martinez* report developed as a means "to ascertain whether there is a

factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  The *Martinez* Report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)).  Therefore, Plaintiff's claim against Defendant DiMarzo survives screening and the Court will order Defendant to answer or otherwise respond to the Complaint by May 24, 2024.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Eighth Amendment claim against Defendant DiMarzo survives screening.

**IT IS FURTHER ORDERED** that Defendant DiMarzo shall answer or otherwise respond to Plaintiff's Complaint by **May 24, 2024.**

**IT IS SO ORDERED**.

**Dated April 23, 2024, in Kansas City, Kansas.**

S/  John W. Lungstrum
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**